[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION CT Page 645
Nature of Proceedings
On January 28, 1993, the Department of Children and Families (hereinafter DCF) filed petitions seeking to terminate the parental rights of Amanda T. in the first four of six children born to her in the preceding eleven years. A fifth child had died in 1989 at nineteen months following an automobile accident; a sixth child, born after the four children here involved were committed to DCF in February of 1992, remains with the mother.
The children petitioned upon are Takneesha C. (pronounced "Taneesha"), born 3/3/84; Shawn C., born 12/3/85; Shanay M., born 5/9/89; and Kenndra M., born 4/25/90. Named as the father of the two eldest children on the termination petitions is Shawn C., who, while never having acknowledged paternity according to court records at time of commitment, had been served by publication and failed to appear, either in person or through counsel, at all subsequent hearings. The putative father of the two younger children, Kenneth M., a/k/a Kenneth W., who, according to the earlier court records, had also never acknowledged paternity of either child, was served both by publication and in hand at the initial hearing, and appeared at all subsequent hearings with court-appointed counsel.
Grounds alleged for the relief sought under Sec. 17a-112 of the Conn. Gen. Stats. (Rev. 1993), applicable to children previously committed to DCF as neglected or uncared for pursuant to Sec 46b-129 were:
 (1) as to both parents of each child, abandonment, failure to rehabilitate and the absence of parent-child relationship in circumstances precluding the establishment or re-establishment of such relationship within a period of time consistent with the best interests of the children;
 (2) as to the parents of the two younger children, acts of commission or omission in that Shanay was alleged to have been sexually abused by Kenneth M. prior to her commitment to DCF on 2/27/92; a fact unknown to DCF and this court at the time of such commitment. CT Page 646
While the latter ground had not been checked on the form used in filing these petitions (JD-JM 40, Rev. 4-92), since facts supporting it were set forth on page 3 of the accompanying "Summary of Facts to Substantiate Petition for Termination of Parental Rights", this ground may be considered under the authority of In Re Michael M., 29 Conn. App. 112, 149 (1992).
In the initial hearing on 2/23/93, both Amanda T. and Kenneth M. appeared, service was confirmed and both were approved for separate court-appointed counsel. The petitioner's motion for an updated psychological evaluation by the same psychologist who had seen this family on earlier occasions was granted and a pretrial set for 6/3/93, at which time trial dates were assigned. Evidence was offered by the state on five trial days between 8/26/93 and 10/29/93. Neither parent offered evidence other than to prove the mother's request for a visit a week before the final trial day. Counsel were given the time requested for the filing of trial memoranda and responses thereto. The last such memorandum was received by this court on 12/15/93.
The operative dates for this decision are as follows: Adjudication must be determined on facts as of 1/28/93, the date of filing of these unamended petitions; disposition must be determined on facts as of 10/29/93, the final date of evidentiary hearing; the period of reserved decision commences on 12/15/93, the date of receipt of the final trial memorandum.
Factual Chronology
Evidence offered in five trial days, interpreted in the light of the prior record in this court concerning these children and their parents, supports the finding of the following chronology of facts:
1. Prior to commitment:
Amanda T. had finished ninth grade and was 16 years old at the time of Takneesha's birth in March of 1984. Her second child, Shawn, born 19 months later, was not yet three when his mother began a relationship with Kenneth M., putative father of Shanay, born in the spring of 1989, and Kenndra, born a year later. Referrals began to be received by DCF (then known as the Department of Children and Youth Services) when Kenndra was an infant. They concerned physical and medical neglect, unsafe CT Page 647 housing and leaving the children with no or inadequate supervision. Neglect petitions were not filed, however, until late January of 1991 when the maternal grandmother, who had been left with the children for weeks at a time in the past, asked DCF to place them after Amanda had dropped them off and failed to retrieve them within a short time. The grandmother, having moved to elderly housing, could not again keep them with her, and had no address at which to contact her daughter. An Order of Temporary Custody (OTC) was given by this court on 1/29/91 and at the mandated hearing on the OTC held on 2/8/91, Amanda stated to the court on the record that neither father had acknowledged paternity. Consequently, neither father was named on the neglect petitions nor notified of those proceedings, pursuant to the definition of "parent" found in P.B. Sec. 1023(j)(4) as then written:
 (j) "Parent" means (1) the natural or adoptive parent, if no substantive judicial decree has divested one or both of them of their statutory coguardianship as created by their marriage or the adoption; (2) any individual or agency whose status as guardian of the person of the child has been established by judicial decree.
Prior to 1981, the section dealt specifically with putative fathers:
 "Parent" means . . . (4) a child's putative blood parent who has expressly acknowledged paternity and contributed meaningfully to the child's support.
Amanda agreed to the continuation of the temporary custody until such time as she could obtain necessary furnishings. This was accomplished by 3/13/92, at which time the court vacated the OTC and the children were returned to their mother. A month later, on 4/16/91, the children were adjudicated to have been uncared for (homeless) at the time of the filing of the neglect petitions, and the allegations of neglect were dismissed without finding or prejudice. On 4/30/91 the court placed the children under Protective Supervision for seven months, with a review in court scheduled for the end of October. Expectations agreed upon in a pretrial conference on 3/21/91 were approved by the court as the conditions on which the eventual dismissal of the petitions CT Page 648 would be based (State's Exhibit B). These included keeping appointments with DCF, keeping her whereabouts known at all times to DCF and to her attorney, ensuring that the two oldest children attended school, keeping all medical appointments for the children, engaging in parenting counseling, cooperating with therapy for Shawn if recommended by an evaluation being arranged by DCF, maintaining adequate housing and income source, and avoiding both substance abuse and involvement with the criminal justice system. In addition, Amanda agreed with the expectation that "children must always be properly supervised." These expectations were signed by the mother, her attorney, counsel for the children, and the judge. (Id.)
Amanda cooperated for the first three months of the period, but a judicial review was requested in the summer of 1991 after the DCF social worker had been unable to make personal contact with the family after the end of May. In a hearing on 8/13/91, the parties agreed to extend the Protective Supervision three months, the court specifically requiring the DCF social worker to see the children at least twice monthly by appointment and to submit a written report the following month. This was not done: In the ensuing five months, no report was submitted by the agency since the original social worker had left on medical leave and her replacement had been unable to locate either mother or children. In a review in court held 12/17/91, DCF reported receiving new referrals on the children which could not be verified because Amanda's whereabouts continued to be unknown. Despite attempts by DCF, court staff and Amanda's attorney to secure her presence, she failed to appear in court on 2/11/92 at a hearing on the petitioner's motion to reopen the judgment. After an evidentiary hearing, decision was reserved and on 2/27/92 judgment was reopened and all four children committed to the care and custody of the Commissioner pursuant to subsection (d) of Section 46b-129 (see Appendix A). By the time this action was taken, Takneesha had already missed 40 days of school and Shawn, notwithstanding the court's expectations agreed to the previous spring, had never been enrolled in any school.
2. Between commitment (2/27/92) and adjudicatory date for termination (1/28/93)
Since Amanda was not present at the time of commitment, no written expectations were prepared on 2/27/92. On June 4, 1992 Amanda finally was located and appeared in court with counsel. After giving her latest address, she signed an amended list of CT Page 649 expectations designed to secure reunification of the family (State Exhibit C). These included keeping weekly appointments at the Burgdorf Clinic, visiting the children as often as permitted, and participating in both individual and group therapy, most of these activities in which she had been engaged for the preceding three months. Curiously, compliance stopped altogether following the court hearing of June 4: Weekly appointments at Burgdorf stopped; only two more visits were requested with the younger children and no visits requested or attempted with the two older children, and no phone calls, mail or gifts were directed to any of the children in foster homes. Kenneth M., who had accompanied Amanda on one of the visits to Burgdorf, also made no request for contact with his daughters or offered any plan as an alternative to their continued foster placement.
While Amanda had kept an initial appointment at Child and Family Services to initiate her own counseling, she did not return for any subsequent appointments. (State's Exhibit A).
During the first months of their commitment, behaviors and statements made by the girls led to the suspicion of sexual abuse. Both physical and psychological evaluations by a variety of expert witnesses (psychologists Kaufman and Freedman; sexual abuse expert Freudenthal, pediatric nurse practitioner and sexual abuse evaluator Courtney, pediatrician Dr. Berrian) support the conclusion that both Shanay and Takneesha had been sexually abused by Kenneth M. prior to their removal from their mother's home.
The two older children were in a foster home just over the Hartford line in an adjoining town. No restrictions were ever placed on Amanda's visiting with these children. In the eleven months between commitment and the initiation of this termination action, these children received four phone calls from their mother. She never gave lack of transportation as a reason for failing to visit nor did she request help with transportation. The two younger children were in a foster home in Hartford, with visits arranged at the DCF offices upon request. Two visits had taken place in May of 1992 in connection with the weekly visits to the Burgdorf Clinic; only two more visits in the mother's apartment were arranged at her request in the summer of 1992. Kenneth M. made no such requests at any time during this period.
Despite the requested expectation that Amanda keep her whereabouts known at all times, it took the newly-assigned worker CT Page 650 months of leaving messages at the last known addresses or with the maternal grandmother before any contact could be made.
Adjudication — On facts as of 1/28/93:
Waiver of 12 months: Grounds must exist as of 12 months in order to be the basis for termination of parental rights, unless waiver of that period is found, from the totality of the circumstances, to be necessary to promote the best interests of the child. (Subsection (c) of Sec. 17a-112). In this case, waiver of one of the 12 required months is deemed to be necessary in view of the total failure of compliance with all expectations for the eight months preceding the adjudicatory date, and, even with this termination action pending, it was not until late spring of 1993, after the setting of trial dates, that both Amanda and Kenneth began to seek visitation. At no time, either before or after the setting of such trial dates, has either parent secured adequate housing, initiated counseling or acknowledged the sexual abuse that a variety of experts had confirmed. In view of the consistent absence of both parents from the lives of the two younger children, and of Amanda from the lives of her two oldest children, the waiver of the single month is deemed appropriate and necessary.
1. Abandonment: To terminate a parent's rights under Sec.17a-112, it is not necessary to establish common-law abandonment, meaning a total and intentional cessation of all contact. The statute here applicable requires a finding, by clear and convincing evidence, that:
 . . . the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child.
After a few visits with her younger children at the outset of their commitment, all arranged in connection with the expected weekly counseling at Burgdorf, the visits as well as the counseling stopped. No visits with the two older children were requested. Four phone calls and one birthday gift for one of these children does not constitute a "reasonable degree of interest, concern or responsibility as to the welfare" of her children by Amanda. Accompanying Amanda on one clinic visit in order to see his daughters similarly does not constitute a reasonable degree of interest, concern or responsibility for them by Kenneth M. The birth of a fifth child to Amanda during this CT Page 651 period does not preclude the finding of abandonment, in this statutory sense, of her four older children in foster homes. No requested visit by either parent was ever denied, and DCF provided transportation and a locus for visits whenever such visits were made.
Conclusion: The petitioner has established by the requisite clear and convincing proof that Amanda T. has abandoned all four of these children within the definition of that term in the applicable statute and that Kenneth M. has abandoned the two little girls who bear his last name. The total absence from the lives of Takneesha and Shawn of their putative father, Shawn C., is clear and convincing proof that these children have been abandoned by Shawn C.
2. Failure to Rehabilitate: Whether or not the court has spelled out expectations at the time of commitment, this ground for terminating parental rights must be determined by comparing the parents' ability to care for the child at the adjudicatory date of the termination petition (here, 1/28/93) with that ability — or lack thereof — at the time that child was committed as neglected or uncared-for and, based on that comparison, determine whether the parents have, in the interval, achieved ". . . such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child." There can be no serious suggestion that Amanda's ability to provide adequate care for her four children here involved was as good or better on 1/28/93 than it was at the time they were committed to DCF eleven months earlier. After her initial involvement with counseling and a few visits, Amanda dropped out of the lives of these children. Although every request made for a visit had been granted, there were no requests after the summer of 1992. Counseling was never re-initiated. Her whereabouts continued to be constantly shifting and she communicated neither to her attorney nor to the children's guardian. The two older children, who lived in a neighboring town a short walk from a bus line, saw their mother only once, on a chance encounter on the street. The two younger children, who lived in Hartford and who were transported to DCF offices whenever Amanda requested a visit, did not see her after the summer following their commitment. On 1/28/93, therefore, Amanda appeared to be even less capable of providing these children with adequate care than she had been at the time of their commitment which was necessitated by her demonstrated inability to provide CT Page 652 such care over a period of more than a year. The petitioner has established by clear and convincing evidence that this ground exists to terminate Amanda's parental rights in all four of the children at issue.
Kenneth M.'s position appears to be that this ground is not available for a biological father who was not a participant in the earlier proceeding that resulted in the commitment of his children. Citing no authority, he appears to assert that merely impregnating the mother of his children gives him legal standing to assert parental rights without having to take any formal step that would result in his being required to assume the responsibilities, as well as assert the privileges, of fatherhood. Kenneth M. has never taken any such step and has, consequently, never been required to assume any responsibility for these two little girls, nor has he ever sought to exercise any rights of fatherhood by requesting separate visitation privileges or coming forward to offer any plan as an alternative to continued foster care. Because he elected to remain in the legal shadow of these children's lives, he was not provided with notice of the original neglect petition because he lacked standing as a "parent" under the definition of that term then found in the Practice Book, Sec. 1023(j)(4). Statements made to Dr. Freedman by the mother and children suggest that Kenneth M. was a part of the household from which the children were removed, at least from time to time. Several of the children spoke of Kenneth abusing their mother in their presence and Shanay's statements to several expert witnesses regarding sexual abuse by her father also support the inference that he was a part of that household prior to their commitment. But being part of a household does not establish paternity.
The state has no obligation to hound a biological father into acknowledging paternity; it is that father's obligation to come forward and make known his willingness to assume the legal responsibility — as well as enjoy the legal privileges — of fatherhood by acknowledging paternity or instituting a claim for paternity under Sec. 46b-172a. The record is not entirely clear as to why DCF named him on these petitions to terminate his parental rights since there was offered into evidence no adjudication, acknowledgment, record of contributions to support, birth certificate naming him as the father, or record of claim of paternity under Sec. 46b-172a. Lacking any of these indicia of parenthood, he would not appear to have been entitled even to notice of a termination petition (see Sec. 45a-716, subsection CT Page 653 (b)), but, for whatever reason, he was provided with notice and counsel and given the standing of "parent" throughout these proceedings. Neither the failure of the court to have spelled out expectations for him, as well as for Amanda, at the time of commitment, nor the failure of DCF to offer services designed to reunite him with his children, precludes this court from making the same analysis of his ability to care for these children as was made of their mother: At the time these children were committed as uncared-for/homeless, Kenneth M. had not acknowledged paternity, supported or initiated any action to have himself determined to be the father, or to make a plan for the care of his daughters when their mother was removed as their guardian. In the eleven months following commitment he saw the children twice at the mother's Burgdorf appointments, but made no effort to seek visitation for himself when those appointments stopped. Indeed, during those eleven months he was convicted of burglary, assault and threatening (State's Exhibit K) and visitation, if requested, might have had to take place in prison. On the adjudicatory date his whereabouts were uncertain, his claim to paternity never perfected, his contact with his children suspended, leaving in their memories a mixture of recalled affection, physical abuse of their mother and sexual abuse of Shanay. As with Amanda, Kenneth M., on 1/28/93, was no closer — indeed, farther — from being able to offer a plan for the adequate caretaking of Shanay and Kenndra than he was on 2/27/92.
The absence of the putative father of Takneesha and Shawn C. from the lives of these children establishes by clear and convincing evidence that he, too, has failed to achieve any degree of personal rehabilitation such as to encourage the belief that he would or could ever assume a responsible position in the lives of these children.
3. Acts of Commission and Omission: Unrefuted expert testimony by both medical professionals and clinical witnesses establishes by clear and convincing evidence that Shanay was sexually abused by her father during the period prior to her commitment. Since this information did not surface until after such commitment, Amanda's failure to acknowledge the truth of this allegation or to protect her child from further abuse cannot be regarded as evidence to support this ground as to her. At the time Amanda was informed of this circumstance, Shanay was in the legal guardianship of DCF and Amanda had no legal authority to act to protect her. Consequently, as to Kenneth M. only, this ground exists to terminate his parental rights with regard to this CT Page 654 child.
4. Absence of parent-child relationship: Given the interpretation of this ground in recent cases (In Re Jessica M.,217 Conn. 459, 476 (1991); In Re Valerie D., 223 Conn. 492
(1992); In Re Kelly S., 29 Conn. App. 600 (1992), the relationship of these children with Amanda and Kenneth M. cannot be regarded as either wholly absent or wholly negative. The petitioner's failure to argue this ground in her trial memorandum suggests her acquiescence that it cannot be the basis for terminating the parental inferred, however, that a putative father who has been out of the life of his children for the last three years of their nine and seven-year old lives could not have an ongoing parent-child relationship with these children, either as defined by the statute as ". . . the relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child" or by recent case law as lacking any present memories of positive feelings for the natural parent. Consequently, it is found by clear and convincing evidence that this ground does exist to terminate parental rights of the putative father of Takneesha and Shawn, Shawn C.
Disposition — on facts as of 10//29/93, final hearing date.
All facts, up to and including the final day of evidentiary hearing, must be considered in the dispositive phase of a termination proceeding, the stage in which, if grounds have been found, the court must decide if termination is in the best interests of the children.
In the eight months between the adjudicatory date and the date of disposition, both Amanda and Kenneth have sought, and obtained, increased visitation. Had this level of manifested interest existed in the eight months prior to the adjudicatory date, the ground of abandonment could not have been found. But a flurry of interest in seeing children subject to pending termination petitions does not, of itself, preclude a finding that termination is in the children's best interests. If there had been, during the same period, signs of other improvements in the ability of either Amanda or Kenneth to care appropriately for their children, a finding might be required that a denial of such termination was more consistent with the children's best interests. Unfortunately, no such signs were offered into evidence. Neither parent chose to testify or to put on witnesses CT Page 655 to establish that either was in a stable living situation, that either recognized abuse and neglect of these children prior to their foster placements or had embarked upon any kind of counseling to ensure that such maltreatment would not happen in the future. It is true that the child born to Amanda in 1992 remains in her custody, but that fact alone does not establish her rehabilitation as an adequate parent: All four of the children at issue were older than the child presently with Amanda at the time of their commitment to DCF. Nothing is known of Kenneth except for his involvement in the criminal courts which necessitated the issuance of a habeas corpus ad testificandum in order to secure his appearance at the final trial day. In summary, the only change in the circumstances of the parents since the adjudicatory date is the flurry of requests for visits following the setting of trial dates.
The seven factors set forth in subsection (d) of Sec. 17a-112
must be considered at time of disposition since they are to be considered not in determining if grounds exist to terminate parental rights but rather ". . . in determining whether to terminate parental rights under this section . . .", the ultimate dispositional decision. Consequently, the addition to that list made by Public Act 93-193, effective 10/1/93 — four weeks before the dispositional date for these petitions — must be considered before disposition is entered.
— 1. Both parents argue that DCF was insufficiently diligent in facilitating (or even compelling) adherence to the court's expectations for reunification. No expectations had been spelled out for Kenneth since he had not perfected his standing as a "parent" at the time of the children's commitment. Subsequent to the filing of these petitions (on which the petitioner acceded to his status as parent), no reunification efforts were required. Nonetheless, he was permitted to visit upon request but he offered no plan as an alternative to those made by the petitioner. The state provided timely and appropriate assistance to Amanda in securing compliance with the expectations spelled out for her: Weekly counseling was arranged at the Burgdorf Clinic; visits with the two younger children were arranged whenever requested and Amanda was given the name, address and phone number of the two older children and permission to arrange her own visits with them; when made aware by her attorney that transportation was a problem, a bus token was provided . . . and never used; an initial appointment for individual counseling was arranged for Amanda at Child Family Services. Amanda began the CT Page 656 period of children's commitment by utilizing these proffered services but from the time these expectations were reviewed and approved by the court on 6/4/92, her compliance virtually ceased and she effectively dropped out of the lives of her children and out of the sight of their legal guardian, DCF. Her whereabouts were unknown to DCF for months at a time, and contact could only be obtained by continuing unavailability, the agency had no obligation to do further. Since Kenneth M., as far as the court and agency records went at the time, had never acknowledged paternity, there was no obligation to provide services to facilitate any reunion of Shanay and Kenndra with him. After the revelation and confirmation that he had sexually abused Shanay, such services would have been inappropriate.
— 2. DCF made efforts that were reasonable and appropriate to reunite Amanda with her children at the outset of their commitment. The treatment plan of March 1992, immediately following commitment and submitted to the court on 3/17/92, gave as the permanency goal "reunification with the family", and commented that the mother was willing to work with DCF and social services toward reunification. Six months later, in the treatment plan of September of 1992, the goal had changed in view of Amanda's cessation of counseling and visitation, and her lack of stable housing. Efforts to reunite the family had not included Kenneth M. because of his then lack of standing as an adjudicated or acknowledged father.
— 3. No court orders were entered into and agreed upon by any individual or agency other than the expectations spelled out for Amanda in March of 1991 when her children were returned to her after a two-month temporary placement, and again in June of 1992 following their commitment. The unrefuted evidence establishes by clear and convincing proof that she failed to comply with every one of the expectations on both occasions.
— 4. The two older children express conflicted feelings about living again with their mother. Memories of their life when Kenneth was part of their household are filled with pictures of physical abuse of their mother. Both children, who were dirty and ill-clothed when placed in the foster home, have adjusted well, although manifesting behavioral problems stemming from their early experiences. Both now attend school regularly and are doing well. The younger children, only aged two and one when originally placed in foster care, have been with the current foster family for 16 months, and appear to be thriving in that CT Page 657 environment. The warmth and affection observed between the parents and their children during Dr. Freedman's evaluation in May of 1991 were not inappropriate for a visiting relationship, but do not preclude the psychologist's clear and unrefuted recommendation ". . . that parental rights be terminated for all four children, in order to allow adoption and permanency planning for the children" (State's Exhibit D, p. 9).
Takneesha and Shawn are now nine and nearly eight years of age respectively; Shanay and Kenndra are only four and three. Each of these children has lived away from home for 20 months, as of the dispositional date. During those 20 months their parents have moved no closer to being able to provide for them adequately, either now or in a further period of time they can afford to wait. The older children need the assurance of permanency in a stable and nurturing environment before they manifest more problems than they already display; the two younger children have spent half their lives in foster care with only sporadic contact with their parents, most of which occurred under the shadow of the pending termination petition. Neither parent offered evidence as to their present circumstances, although Kenneth was incarcerated at the time of the last hearing. Neither parent offered clinical evidence to counter the unequivocal recommendation of Dr. Freedman. Neither parent testified as to why permanency should be continued to be denied to these children after 20 months as state wards.
— 6. Shawn C., putative father of the two older children, by remaining whereabouts unknown to the petitioner and to the children, has clearly made no effort to adjust his circumstances to make it possible to assume care of these children at any time in the future. Amanda made a brief effort to become involved in counseling and to maintain contact with the younger children during the first three months of their commitment, but all such efforts ceased in the spring of 1992 and has only revived to the extent of a few visits since this action began. Apart from a few visits, Kenneth has offered nothing to suggest he has even the motivation, much less the ability, to care for Shanay and Kenndra.
— 7. Nothing prevented any of the three parents involved from maintaining a meaningful relationship with these children. While Kenneth M. was not included in the original neglect proceedings because of his lack of standing as an acknowledged father at the time, he was aware of their commitment in the spring of 1992 when CT Page 658 he accompanied Amanda to the Burgdorf Clinic in order to visit with the two younger children. When Clinic visits ceased, he did not make any effort to make a plan to see them or care for them on his own. His long involvement with the criminal justice system (State's Exhibit K) suggests he was aware of the possible availability of court-appointed counsel. He knew who the DCF social worker was in the spring of 1992 since she had brought the children to the Clinic visits. He made no effort to pursue any rights he might have had or been able to perfect when Amanda's efforts at reunification stopped. Requiring visits with the two younger children to take place at the Clinic or DCF offices was not an unreasonable requirement when children are in foster homes. If economic circumstances precluded Amanda's visiting the children in the next town, she never brought that to the attention of the social worker. When, during the pendency of this action, she was provided, at her attorney's request, with a bus pass to the neighboring town, she did not utilize it.
Having considered the foregoing seven factors and the events that have taken place since the adjudicatory date, it is found, by clear and convincing proof, to be in the best interests of each of these children for their parents' rights to be terminated so that they might know, after two years as foster children, the security of permanent homes with competent and stable caretakers. Therefore, it is ORDERED that the parental rights of Amanda T. and Shawn C. in and to the children Takneesha C. and Shawn C. and those of Amanda T. and Kenneth M. in and to the children Shanay M. and Kenndra M., be, and they hereby are, terminated. And it is further ORDERED that the Commissioner of DCF be appointed statutory parent for the purpose of placing such children in permanent homes, and, to ensure achievement of this necessary end, the said Commissioner is ORDERED to submit to this court, in writing, a report as to the progress in achieving permanency no later than 90 days following the date of this judgment, and thereafter in such form and at such intervals as this court may from time to time require. If any one of these children is not placed in final adoption by 5/1/95, said Commissioner is hereby ORDERED to submit by that date a Motion to Review Plan for Terminated Child to be in conformance with Federal Law.
Appeal
The parents have 20 days from the date of this judgment in which to take an appeal. If an appeal is requested and trial counsel is willing to continue representation, this court will CT Page 659 appoint such attorney to act as appellate counsel, at public expense if the appellant is indigent, until all appellate process is completed. Practice Book 4017. If, however, in the exercise of professional judgment as an officer of the Superior Court, the attorney declines to perfect such appeal because, in the attorney's opinion, it lacks merit, such attorney is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Practice Book 4040. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, the reason for this opinion shall be promptly submitted to the court in writing. The party seeking the appeal will then be informed by the court clerk of the balance of the 40 days in which to secure counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. Douglas v. California, 372 U.S. 353 (1963); Fredericks v. Reincke,152 Conn. 501 (1964).
If such procedure satisfies the sixth amendment right to counsel in a criminal proceeding, it is a fortiori appropriate where there are interests of a third party involved: those of the child whose interest in achieving permanent nurturing parents without unnecessary delay is entitled to at least as great a degree of consideration as those of the parents whose rights to raise the child are at issue. Even an unsuccessful appeal could delay permanent planning for years since no child may be adopted until the appellate process is exhausted.
Entered at Hartford this 21st day of January, 1994.
Frederica S. Brenneman, J.